**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-437-APM** |
| **MARK GRODS,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM AND**
**MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Defendant Mark Grods is set to be sentenced on charges of conspiracy and obstruction for his role in plotting with members and affiliates of the Oath Keepers to forcibly oppose the certification of the 2020 presidential election and then participating in the attack on the Capitol on January 6, 2021. Grods pled guilty to these offenses in June 2021, pursuant to a public cooperation plea agreement. In light of Grods' early acceptance of responsibility and substantial assistance to law enforcement, the government requests that this Court sentence him to three years of supervised probation, with the special conditions that the first four months of probation be served on home detention (with permitted leave for work, medical appointments, and religious services), that he perform 120 hours of community service, and that he pay $2,000 in restitution and the mandatory $200 special assessment.

I.    **FACTUAL BACKGROUND**

A.    **The January 6, 2021 Attack on the Capitol**

The government refers the court to the stipulated Statement of Offense filed in this case,

1

ECF 8, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the 2020 presidential election.

### B.    The Defendant's Role

On the afternoon of January 6, when it became clear that Congress was going forward with the certification of the 2020 presidential election, and a riot had begun at the United States Capitol, Grods joined several other members and affiliates of the Oath Keepers in boarding golf carts and heading to the Capitol. ECF 8 at ¶13. As the group zipped around police barricades, another member of the group "livestreamed" a video to Facebook in which he stated that the group was "headed to the Capitol" because "patriots storm[ed] the Capitol building." Gov. Exh. 1508.[1] He further described the situation as "f***ing war in the streets right now." *Id.* The group parked their golf carts just outside the entrance to the Capitol grounds and Minuta told them, "Word is that they got in the building. Let's go." *Id.*

As the group crossed into the restricted area of the Capitol grounds and joined the mob outside the Capitol, Grods and the other members of the group started marching hands-on-shoulder and maneuvered their way through the throngs from the west side to the east side of the Capitol. *Id.* At about 3:15 p.m., three members of the group—Joshua James, Roberto Minuta, and Jonathan Walden—breached the Capitol through the East Rotunda doors. *Id.* Grods followed a few minutes later. *Id.* At the time, he was wearing a backpack, tactical gloves, and boots, and he was carrying a large stick. ECF 8 at ¶14. Other members of the group wore additional tactical gear, like protective vests and goggles. Gov. Exh. 1508. Grods did not proceed further into the building than

---

[1] This and subsequent references herein to transcripts and trial exhibits are all from the trial of *United States v. Roberto Minuta, et al.*, No. 22-cr-15-APM, unless otherwise stated.

the foyer just inside the East Rotunda Doors, however, because riot police started clearing the building a short while after he entered. *Id.* After Grods and the rest of the group left the Capitol, they met up with other Oath Keepers members and affiliates just outside the Capitol. Gov. Exh. 1081.1A.

Grods' participation in the attack on the Capitol was not random; it was the culmination of weeks, if not months of increasingly violent calls by the leader of the Oath Keepers, Stewart Rhodes, to oppose the lawful transfer of power from Donald Trump to Joseph Biden. Grods was privy to these communications, as a member of the Alabama chapter of the Oath Keepers. Grods told law enforcement that he had joined the group several years earlier, when he lived in Florida, because the group consisted of "like-minded people who serve, protect, and uphold the constitution." 3/15/21 FBI Interview. He also thought he could help his community through participation in the group's hurricane and disaster relief efforts. *Id.*

In the fall of 2020, however, the group's focus was on opposing what they saw as a fraudulent presidential election, including by force, if necessary. On December 23, 2020, Rhodes published another open letter to President Trump on the Oath Keepers' website in which he warned that if President Trump failed to stop Congress' certification of the election, which was scheduled to occur on January 6, 2021, "you will leave We the People no choice but to walk in the Founders' footsteps, by declaring the regime illegitimate, incapable of representing us, destructive of the just ends of government—to secure our liberty—and to be a mere puppet of a deadly foreign enemy. And, like the Founding generation, we will take to arms in defense of our God given liberty." Gov. Exh. 1008. Rhodes promised that "millions of American military and law enforcement veterans, and many million more loyal patriotic American gun owners stand ready to answer your call to

arms, and to obey your orders to get this done." *Id.* Alabama Oath Keepers leader Joshua James forwarded that letter to Grods and described it as something that "needs to be read before starting" a call that James and Grods were about to join with other Oath Keepers:



Shortly thereafter, Grods agreed to travel to D.C. with the Oath Keepers for the events of January 6. Grods joined James on several Oath Keeper planning calls for the operation. James described Grods in Signal messages as the "2nd for [the] state" of Alabama:



Grods was also added to encrypted group chats like "DC OP: Jan 6 21." Rhodes described the chat as "THE DC op thread for all leadership coming in, from multiple states, and together with the overall DC op leadership." Gov. Exh. 9514 (Msg. 1.S.159.108). Rhodes, James, Grods, and other co-conspirators used this Signal group chat and others to plan for January 6, 2021. *Id.* On the chat, the group coordinated plans for lodging and transportation and had extensive conversations about what weapons and gear they would bring, among other details. Gov. Exhs. 9514, 9557. They arranged for an armed "quick reaction force" to guard a cache of weapons just outside the District,

that would ferry the weapons into the city when called by Rhodes. *See, e.g.*, Gov. Exh. 9514 (Msg.s 1.S.159.450, 524-26).

On January 4, 2021, Grods traveled with James and several other co-conspirators to the Washington, D.C., metropolitan area in two vehicles. ECF 8 at ¶10. Grods brought a shotgun, a semi-automatic handgun, and ammunition for both, and he provided them to a co-conspirator to store those items in a hotel in Virginia where Rhodes and James were staying. *Id.* at ¶11.

On the morning of January 6, 2021, Grods and other Oath Keepers were supposed to provide supplemental security for Roger Stone, but Mr. Stone ultimately did not leave his hotel, so Grods and the other Oath Keepers in his group attended part of the event at the Ellipse and then went back to a nearby hotel to regroup. 3/15/21 FBI Interview. At around 1:25 p.m., when it became clear that President Trump and Vice President Pence were not going to intercede to stop the Certification of the Electoral College vote, and as a large crowd gathered on the Capitol grounds and converged on the building, Rhodes messaged the DC OP: Jan 6 21 chat: "Pence is doing nothing. As I predicted." Gov. Exh. 1500.2. At 1:38 p.m., Rhodes sent another message to the chat stating, "All I see Trump doing is complaining. I see no intent by him to do anything. So the patriots are taking it into their own hands. They've had enough." *Id.* In the context of all the messages Rhodes and his co-defendants had exchanged in the lead-up to January 6, these words were a call to action.

On yet another encrypted, invitation-only group chat titled "Jan 5/6 DC Op Intel team," which included Rhodes, James, and others, a participant posted a link to a video titled "live stream of patriots storming capital," and another participant asked, "Are they actually Patriots - not those who were going to go in disguise as Patriots and cause trouble[?]" Gov. Exh. 1500. Rhodes

responded, "Actual Patriots.   Pissed off patriots[.]   Like the Sons of Liberty were pissed off patriots[.]" *Id.* James responded, "We're coming to the Capitol ETA 30 MIN." *Id.* James and several co-conspirators (including Grods) then headed toward the Capitol. *Id.*

Grods admitted in the statement of offense that he adopted as part of his guilty plea that, at the time he unlawfully entered the U.S. Capitol building on January 6, 2021, he "believed that he and the co-conspirators were trying to obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote," and that he "acted to affect the government by stopping or delaying the Congressional proceeding, and, in fact, did so, by intimidating and coercing government personnel who were participating in or supporting the Congressional proceeding, and, in fact, did so . . . by intimidating and coercing government personnel who were participating in or supporting the Congressional proceeding." ECF 8 at ¶¶17-18.

On January 8, 2021, James forwarded Grods a message from Rhodes and a co-conspirator named Kellye SoRelle that encouraged Oath Keepers to delete incriminating evidence from their phones:



James told Grods; "We need to make sure that all signal comms about the op has been deleted and burned." Grods complied. ECF 8 at ¶20.

## I.    THE CHARGES AND PLEA AGREEMENT

On June 30, 2021, Grods waived his right to trial and pled guilty to Conspiracy, in violation of 18 U.S.C. § 371, and Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2.

## II.    STATUTORY PENALTIES

As noted by the Presentence Report issued by the U.S. Probation Office, on the conspiracy count, Grods faces up to five years of imprisonment, and on count two, he faces up to 20 years of imprisonment. ECF 33at ¶¶157-158. Each charge also carries a term of supervised release of not more than three years, a fine of up to $250,000, restitution, and a mandatory special assessment of $100. *Id.*

## III.    THE IMPACT OF *FISCHER*

Since Grods' guilty plea, in *United States v. Fischer*, the Supreme Court held that to prove a violation of 18 U.S.C. § 1512(c)(2) "the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or as we earlier explained, other things used in the proceeding, or *attempted* to do so." 603 U.S. ----, 144 S. Ct. 2176 (June 28, 2024) (emphasis added). The parties agree that the facts admitted to by Grods in his statement of offense during his guilty plea are sufficient to establish an attempted violation of Section 1512(c)(2). Nonetheless, out of an abundance of caution, the parties have attached here an addendum to the Statement of Offense. The parties would ask that the Court place Grods under Oath at the start of the sentencing hearing to have him adopt the supplemental statement of offense, to make sure he understands the elements of the offense of obstruction of an official proceeding, as clarified by the Supreme Court in *Fischer*, and to have the parties declare on the record their position that there is a sufficient factual basis to support Grods' guilty plea.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c) and § 1B1.1, cmt. (background). The Guidelines apply to a "heartland of typical cases." *Koon v. United States*, 518 U.S. 81, 94-95 (1996). A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed "outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole. *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up).

### A.    The Calculation of the Parties and the Presentence Report

At the time of the plea agreement, the parties estimated Grods' total offense level to be 24, resulting in a Guidelines range of 51 to 63 months' imprisonment. ECF No. 7 at 4. However, this estimate was based on the presumption of the applicability of two specific offense characteristics under U.S.S.G. § 2J1.2 having to do with the interference with the administration of justice. Since that time, the D.C. Circuit decided *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024), which held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not apply to Congress' certification of electoral college votes. *See id*. at *8. Accordingly, the enhancement in U.S.S.G. § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice," does not apply where a defendant interfered solely with the certification of electoral college votes. U.S.S.G. § 2J1.2(b)(2); *Brock*, 2024 WL 875795, at *15. This holding also precludes application of the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of electoral college votes.

Thus, the following Sentencing Guidelines sections apply to both counts of conviction:

| U.S.S.G. § 2J1.2 | Base Offense Level | 14 |
| U.S.S.G. §2J1.2(b)(3)(C) | Extensive Scope, Planning, Preparation | +2 |
| U.S.S.G. §3C1.1 | Obstruction (destroying documents) | +2 |
| U.S.S.G. §3C1.1 | Minor Role | -2 |
| U.S.S.G. §3E1.1(a) | Acceptance of Responsibility | -3 |
| | Total | 13[2] |

The two counts of conviction are grouped for guideline calculation purposes because they involve the same victim and one or more acts or transactions. U.S.S.G. §3D1.2(b).

It is worth noting that, in addition to the fact that the adjustment under U.S.S.G. §4C1.1 was not contemplated by the parties at the time of the plea agreement, the defendant does not meet the criteria at U.S.S.G. §4C1.1, as he played a role in transporting firearms in furtherance of his offenses of conviction. U.S.S.G. §4C1.1(a)(7).

At a level 13, the recommended sentencing range would be 12 to 18 months of incarceration.[3]

**B.    Downward Departure for Substantial Assistance**

The government moves, pursuant to U.S.S.G. § 5K1.1, for a downward departure for the substantial assistance Grods has provided to law enforcement. The government submits that a four-

---

[2] This calculation differs slightly from that of the Presentence Report, ECF 33 at ¶¶98-109, which does not adopt a minor role adjustment. ECF 33 at ¶103. But the plea agreement included a minor role adjustment, ECF 7 at 3, so the government is including that adjustment here.

[3] In other cases, following the Circuit's decision in *Brock*, the government has asked the Court to depart upward under Section 5K2.7 (Disruption of Governmental Function), and/or Section 5K2.6 (Weapons). The government is not advocating for such departures here, because the parties agreed under the terms of the plea agreement to not advocate for any upward or downward departures outside of the departure for substantial assistance to law enforcement. ECF 7 at 4.

level downward departure is appropriate given the level and nature of assistance Grods has provided.

The Guidelines provide that, "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1. In determining the appropriate level of reduction to apply, the Court should consider the following factors:

> (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3) the nature and extent of the defendant's assistance;
>
> (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
>
> (5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a).

Here, the second and fifth factors clearly apply and can be quickly addressed. Grods contacted the FBI through his counsel in March 2021 and arranged to be interviewed to admit his responsibility in the attack on the Capitol. While Grods was on the radar of law enforcement prior to then, because his cell phone number had shown up as being in the area of the Capitol on January 6th and in communication with other Oath Keeper members and affiliates who breached the Capitol building and grounds that day, the government did not know the full extent of Grods' conduct or what he looked like on January 6. In other words, Grod self-identified himself as a member of this

conspiracy. And Grods has been cooperating with law enforcement ever since. He has debriefed extensively with the government and pled guilty as soon as he was afforded the opportunity, becoming the second person to plead guilty to a conspiracy offense related to the January 6 attack on the Capitol, one week after co-conspirator Graydon Young. That plea was pursuant to a cooperation plea agreement that Grods agreed to be made public. In other words, Grods' cooperation was extremely timely. U.S.S.G. § 5K1.1(a)(5).

Grods' cooperation has also been truthful, complete, and reliable. Much of the information he provided has been corroborated by other witnesses and objective evidence such as messages, video, photographs, and other data recovered from his phone, from public source information and articles, and from the devices and accounts of others recovered by law enforcement during this investigation. In other words, the second factor listed above also supports a finding of substantial assistance by Grods. U.S.S.G. § 5K1.1(a)(2).

With respect to the significance, usefulness, nature, and extent of Grods' assistance (the first and third factors), Grods provided consent to law enforcement to search his phone (although, as noted above, Grods deleted much of the pertinent evidence from his phone two days after the attack on the Capitol). As noted above, Grods debriefed extensively with the government. He testified before the grand jury. And Grods was willing to and prepared to testify at trial, although his testimony ultimately was not needed. In sum, Grods' cooperation with the government has been substantial and complete. U.S.S.G. § 5K1.1(a)(1), (3).

This cooperation was not without risks. As mentioned above, Grods was among the first members of this conspiracy to plead guilty, and he did so pursuant to a public cooperation plea agreement, in a case that has garnered significant national interest and, sadly, controversy. This

took courage on Grods' part. This Court should give Grods credit for the danger and risk of injury to himself and to his family that resulted from his cooperation in this case. U.S.S.G. § 5K1.1(a)(4).

Taking all of these factors into account, a four-level downward departure would reduce Grods' adjusted offense level by about 31 percent from the government's estimated final adjusted offense level of 13, which he would have faced absent his cooperation in this matter. The government submits that such a reduction appropriately reflects the principles outlined above that this Court should consider in assessing the level of assistance Grods provided to law enforcement.

### C.    Sentencing Guidelines Recommendation

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. ECF 33 at ¶6. Under U.S.S.G. § 5C1.1(c)(3), because level 9 is in Zone B of the Guidelines, the Court may satisfy the minimum term of imprisonment in this range by imposing "a sentence of probation that includes a condition or combination of conditions that substitute . . . home detention for imprisonment according to the schedule in subsection (e)," which suggests "one level of home detention for one day of imprisonment," U.S.S.G. § 5C1.1(e)(3). In other words, a sentence of probation with a period of four months of home detention would be a Guidelines-compliant sentence at level 9.

### V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the government's recommended sentence.

### A.    Nature and Circumstances of the Offense

As described above, Grods' conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the

peaceful transition of presidential power, and throwing the United States into a Constitutional crisis. Perhaps even more alarmingly, these actions were not spontaneous for Grods and his co-conspirators—they were in furtherance of a conspiracy hatched weeks earlier to take any means necessary, up to and including the use of force, to stop the lawful transfer of power from Donald Trump to Joseph Biden by obstructing Congress' certification of the Electoral College vote. Grods came to D.C. understanding the potential for, and in many ways hoping to participate in, a forcible interruption of the certification of the election. He wanted to fight and knew his group had brought weapons to support the effort—and had contributed weapons to the effort. Then Grods ultimately joined the violent mob that breached the Capitol in furtherance of this conspiracy. The nature and circumstances of Grods' offense were of the utmost seriousness, and fully support the government's recommended sentence.

### B.  The History and Characteristics of the Defendant

The defendant was unemployed at the time of this offense. ECF No. 33 at ¶138. According to the Pre-Sentence Report, employment records showed that from September 21, 2015, to April 10, 2020, Grods worked as a service technician at a commercial appliance repair business in Florida, and he is currently employed as an appliance delivery coordinator for a retailer, where he has worked since March 2021. The period of unemployment that coincided with the instant offenses was due to the pandemic and issues with Grods' back and knees.

Grods is a veteran. He served in the United States Army for about two years as a Combat Engineer. He was honorably discharged from service.

Grods has no criminal history.

In other words, Grods' crimes on January 6 were an isolated incident in an otherwise law-

abiding life.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a significant period of probation, with conditions such as a period of home detention, community service, and restitution, as part of the defendant's sentence. Grods' criminal conduct on January 6 was the epitome of disrespect for the law. At the same time, Grods has fully accepted responsibility for this offense. Such complete and public acceptance of responsibility helps to promote respect for the law, as would a sentence that takes into account the steps Grods has taken to cooperate with this investigation and to make amends for his offenses.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

Because of the unique circumstances of this case, a probationary sentence is appropriate "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] At the same time, early and public acceptance of responsibility, coupled with his cooperation with law enforcement, is something that should be rewarded, to encourage others to take similar responsibility for their conduct on January 6. For these reasons, a period of home detention, followed by a lengthy probationary sentence, achieves the goal of general deterrence.

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. The government is recommending a Guidelines-compliant sentence, should the Court apply the government's recommended departure for substantial assistance to law enforcement.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). The government's recommended sentence does not create

unwarranted disparities in consideration of the substantial assistance the defendant has provided

to law enforcement, the risk to his and his family's safety that it has caused, and his complete and

public acceptance of responsibility for his conduct.[5]  Moreover, the government's recommended

sentence is consistent with the sentences the government requested, and the Court imposed, in the

related cases of *United States v. Jason Dolan and Graydon Young*, 21-cr-28-APM, and *United

States v. Caleb Berry*, 21-cr-460-APM.  Those cases involved cooperation pleas to the same

charges in related matters and are the best comparators to Grods' case.

## VI.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579,

96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[6]  Generally, restitution under the VWPA must "be tied to the loss

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Here, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Grods must pay $2,000 in restitution.[7] ECF 7 at 9-10. As the Presentence Report reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. ECF 33 at ¶8, n.3. For the reasons outlined in greater detail in the restitution brief submitted in the related *Rhodes* matter, *see* Case No. 22-cr-15, ECF No. 654, which the government incorporates by reference, the government submits that $2,000 represents an appropriate and proportional amount of restitution for Defendant Grods to pay.

## VII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of three years of probation, with the special conditions that the defendant spend the first four months of probation on home detention (with permitted leave for work, medical appointments, and religious services), that he perform 120 hours of community service, and that he pay $2,000 in restitution and the mandatory $200 special assessment.

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY: _____

Kathryn L. Rakoczy
D.C. Bar No. 994-559
Assistant U.S. Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W., Room 5.236
Kathryn.Rakoczy@usdoj.gov